[L. A. No. 19435. In Bank. June 20, 1952.]

THE ROSICRUCIAN FELLOWSHIP (a Corporation) et al., Appellants, v. THE ROSICRUCIAN FELLOW-SHIP NON-SECTARIAN CHURCH (a Corporation) et al., Respondents.

Rollin L. McNitt, Homer C. Compton and Edythe Jacobs for Appellants.

Stewart, Shaw & Murphey, Luce, Forward, Kunzel & Scripps, Fred Kunzel and William L. Murphey for Respondents.

CARTER, J.—This is an appeal from a judgment that plaintiff take nothing by its action to obtain, among other things, an injunction against the use of the name "The Rosicrucian Fellowship" and declaring the rights of the parties in response to defendants' cross-complaint for declaratory relief.

Plaintiff, The Rosicrucian Fellowship, is a corporation formed in 1913. Cross-defendants are plaintiff and the trustees of that corporation. Defendants and cross-complainants are a church corporation, formed in 1944, The Rosicrucian Fellowship Non-Sectarian Church, Mrs. Heindel, and followers of the rosicrucian philosophy. The controversy mainly concerns whether plaintiff corporation or defendant corporation and the unorganized followers have rights in connection with certain property acquired in the course of the development of the religious group known as "The Rosicrucian Fellowship."

The preliminary background of the religious movement is not disputed. According to the findings of the trial court, Max Heindel, after study in Europe in 1908, wrote a book called "The Cosmo-Conception of Mystic Christianity" which he used as a basis for teaching what he described as the rosicrucian philosophy to organized groups of followers, called centers, in various cities in the United States. He classified his followers, with respect to their proficiency in the philosophy, as disciples, probationers and students. In 1910, Heindel married defendant Mrs. Heindel who thereafter assisted him in writing, teaching and obtaining followers. The Heindels and their followers constituted, until July 6, 1944, an unincorporated church association known as "The Rosicrucian Fellowship." This association, as distinguished from plaintiff corporation, was without an ecclesiastical system of church government until July 6, 1944, when the defendant corporation was formed.

In 1911, Heindel purchased, with his wife's assistance, taking title in his name, real property in San Diego County

called by them "Mt. Ecclesia." Improvements were made on the property by them prior to Heindel's death and by Mrs. Heindel thereafter with funds received by them and later by plaintiff corporation from contributions from followers and the sale of writings. Heindel indicated by letters to his followers that he held the property in trust for the use and benefit of the followers of the philosophy. [In 1913, the Heindels formed plaintiff corporation, named "The Rosicrucian Fellowship," for the purpose of transferring to it the property known as Mt. Ecclesia and some temporal functions of the unincorporated church association.] [The articles of incorporation expressed the purpose "to establish a college or seminary for the study" of the rosicrucian philosophy. Under the articles and by-laws the followers were not members of the corporation.] It was formed and the amendments to its articles, later mentioned, were adopted without their approval or consent, or the approval or consent of the unincorporated association previously mentioned.

The court found that from 1913 until his death in 1919, Heindel held title to Mt. Ecclesia, and he and his wife, with the assistance of their followers, members of the unincorporated church association, conducted all the so-called ecclesiastical functions for the church association, and at all times, [until July 6, 1944, Mrs. Heindel and members of the church association conducted all such ecclesiastical functions of the philosophy, which included teaching, preparing and disseminating writings and soliciting members.]

Mrs. Heindel, between 1916 and 1919, became the owner of all the writings of her husband by assignment and will. (She is still the owner subject to the 1931 contract later mentioned herein.) [In 1919, after Heindel's death, Mrs. Heindel conveyed Mt. Ecclesia to plaintiff corporation in trust for the use and benefit of the followers of the philosophy as members of the church association [later plaintiff corporation acquired an additional 10 acres), and later as members of defendant corporation.

[In 1925, the articles of plaintiff corporation were amended to include among the purposes the establishment of a non-sectarian church] (to teach and disseminate the rosicrucian philosophy) and a sanitarium. [In 1931, the articles were again amended, declaring the establishment of a college of learning to teach and disseminate the philosophy, to be one of the purposes.] A 1935 amendment changed the name to

"The Rosicrucian College." In 1940, the articles were amended to recite that the corporation was formed under the nonprofit college incorporation law; the name was changed back to "The Rosicrucian Fellowship" and the purpose was again declared to be for the establishment of a church or religious organization to disseminate the rosicrucian philosophy.

In January, 1943, the members of the church association organized (287 of them) an association for a church institution, which on July 6, 1944, was incorporated—defendant corporation—with the declared purpose of organizing and conducting a church. By-laws and rules were adopted for a complete system of representative church government.

Dissension developed in the organization in 1931 when Mrs. Heindel withdrew from The Rosicrucian Fellowship and moved to Oceanside where she established an organization known as the Max Heindel Rose Cross Fellowship which undertook to carry on activities relating to the advancement of the rosicrucian philosophy. In settlement of the controversy with respect to the use of the writings, a contract was made between plaintiff corporation and Mrs. Heindel in October, 1931, in which it was recited that there existed a controversy between them concerning the legal ownership of the writings, and that Mrs. Heindel had established an organization for disseminating the teachings theretofore distributed by plaintiff. It was agreed that plaintiff should have an "undisputed, irrevocable license, right and permit" to publish, sell, etc. all writings; that, subject to plaintiff's right, Mrs. Heindel was the owner for life of the writings, which would vest on her death in plaintiff. Neither party should authorize others to distribute the writings without the consent of the other, except that Mrs. Heindel could give a license to an organzation formed or sponsored by her; plaintiff was to provide a life annuity for Mrs. Heindel, paying $125 per month; if she ceased her activities competitive with plaintiff before January 15, 1934, the annuity would be increased to $208.33 per month; provision was made for arbitration; a statement was to be sent to all followers that the controversy was settled. The court found that defendant corporation is sponsored and led by Mrs. Heindel. In October, 1934, another contract was made by the same parties in which was recited some of the main provisions of the 1931 contract and that Mrs. Heindel had formed a corporation sole, Max Heindel Rose Cross Philosophies,

which was distributing the writings and had a following of 2,050; that plaintiff corporation has continued its activities since the "schism," having 4,500 followers; that each has certain assets; that Mrs. Heindel and her corporation and followers have been asked to unite with plaintiff and they have accepted and the parties have agreed to a consolidation. In consideration of $1.00 paid by each to the other and other valuable consideration it was agreed that Mrs. Heindel's corporation shall be dissolved and its books and equipment shall be transferred to plaintiff and paid for at a specified price. The 1931 contract was continued in force except that Mrs. Heindel did not have the right to grant to any organization the right to use the writings. Mrs. Heindel's annuity was fixed at $125 per month. As a part of the consideration, Mrs. Heindel was to have living quarters and sustenance at Mt. Ecclesia for life; to be elected a trustee of plaintiff and "elected" chairman of the "executive or governing committee"; to become the "manager" in charge of activities of plaintiff under the committee of five, naming three of them; the lessons and letters to be signed by her on behalf of plaintiff; and she was to be editor of the magazine. It was finally recited that: "All the parties hereto are of one mind upon the proposition that the schism referred to above has caused great misunderstanding upon the part of many people and has injured and delayed the progress of the work. It is believed by all concerned that a repetition of conditions which resulted from this schism is to be avoided in view of the fact that Max Heindel, as a representative of the Elder Brothers of the order brought these teachings to the people, and that Mrs. Heindel spent years of her active life helping to build up the institution, that a part of the consideration of this contract should be assurance to her that if at any time she ceases to be active in connection with the work and retires from authority, that she shall then become President Emeritus of the organization for life, and that her annuities, her living quarters and her sustenance shall continue during her lifetime, and that she will cooperate with the Fellowship to the end that the teachings of the Rosicrucian Philosophies may be given to the world to the best possible advantage." The court interpreted the contract to mean that the consideration running to Mrs. Heindel was that she was entitled to be a trustee, chairman of the governing committee and manager of plaintiff corporation at all times thereafter until she voluntarily re-

tired. The corporation performed its promise until February, 1942, when she was removed from the positions against her wishes. On October 7, 1944, Mrs. Heindel gave notice of cancellation of the 1934 contract.

The troubles evidently came to a head after Mrs. Heindel was removed from her positions, for on April 6, 1942, Weaver, Munson and Grow, as members of the unincorporated church, commenced an action in the Superior Court of San Diego County. The action was against plaintiff corporation and the trustees thereof, and it was there found that they sued on behalf of 500 members of the church. Plaintiffs there sought a declaration that they and the other members had a right to participate in the election of trustees of plaintiff corporation and to recover $41,939.56, alleged to have been misapplied by the trustees in the operation of the sanitarium at Mt. Ecclesia during the period from 1939 to 1942. The judgment in that action declared that plaintiff corporation was existing and that its articles were legally amended in 1925, 1930, 1931, 1935 and 1940, and all its by-laws were legally adopted; the followers of the rosicrucian philosophy constitute a church known as "The Rosicrucian Fellowship" as distinguished from plaintiff corporation; that the church has no ecclesiastical organization or system of church government; that plaintiff corporation owns and holds Mt. Ecclesia as trustee for the members of the church; that the church members are entitled to an accounting from the corporation for misapplication of funds; that the followers of the philosophy and members of the church are not corporate members of the corporation and are not entitled to vote for the election of trustees; that the church has no spiritual head; and that the removal of Mrs. Heindel in February, 1942, as president of plaintiff corporation was legal*

Based upon the findings the court in the case at bar rendered judgment declaring that all of Mt. Ecclesia and all personal property thereon was owned by plaintiff corporation but that the church association and defendant corporation and followers were entitled to the dominant use of the property for so-called religious purposes without interference inasmuch as plaintiff corporation held it only as a trustee and they were beneficiaries. It was also declared that such beneficiaries had the dominant right to enjoy and use such

*That action was entitled *Weaver* v. *Meyncke* and the judgment became final in the superior court.

property for such functions which include "lecturing, teaching of the Rosicrucian Philosophy to people interested therein; the establishment of centers for the study and teaching of Mystic Christianity as interpreted and expounded by Mr. and Mrs. Max Heindel in all books, pamphlets and letters written by them, or either of them; issuing and revoking charters of any and all centers; the preparation of correspondence courses for the study, teaching and dissemination of the Rosicrucian Philosophy; the preparation of all ecclesiastical and esoteric lessons and letters to Students, Probationers and Disciples; the preparation of horoscopes and astrodiagnosis thereof for the assistance and guidance of Students, Probationers and Disciples in alleviating mental and physical suffering, difficulties and problems; the recommendation of diets for the physical welfare of Students, Probationers and Disciples requesting the same; corresponding with Students, Probationers and Disciples in the United States and elsewhere regarding the said religious belief, and the teaching and dissemination thereof; to suspend and expel Students, Probationers and Disciples according to its by-laws, rules and regulations"; that plaintiff corporation has not acquired the right and may not use the property to perform any of those functions, and the church association and said beneficiaries have not lost any of such rights by waiver or estoppel; that plaintiff corporation may use the property in the conduct of the temporal functions including "the printing, publishing, selling of said books, pamphlets and letters written by Mr. and Mrs. Max Heindel from and after October 23, 1931; the printing or multigraphing and mailing of ecclesiastical and esoteric letters and lessons written by Mrs. Max Heindel or other Probationers or Disciples designated by the Rosicrucian Fellowship Non-Sectarian Church; the possession and use of a mailing list of Students, Probationers and Disciples and addressograph plates and machinery for the transposition thereof, for mailing purposes only; the operation of a lodge and a cafeteria; the receipt and recording of Students' monthly report cards and Probationers' monthly reports; the employment and discharge of employees for said purposes; the receipt of gifts and contributions specifically designated for said corporation; the collection of monies from its sale of said books, pamphlets and letters and from the operation of said lodge and cafeteria; the payment of salaries and taxes; the manage-

ment and maintenance of said real property fixtures, improvements and personal property thereon; all for the account and benefit of the Probationers and Disciples, as members of the said unincorporated church association and as members of The Rosicrucian Fellowship Non-Sectarian Church, beneficiaries thereof''; that Mrs. Heindel is the owner of all the copyrights on all the writings; that the church association and defendant corporation and members may use the name "The Rosicrucian Fellowship"; that the members of the defendant corporation and followers of the philosophy own the list of names and addresses of all followers; that the 1934 contract above referred to was breached by plaintiff corporation and is "null and void" but the corporation has the nonexclusive right under the 1931 contract to publish and sell the writings; that defendant corporation has a nonexclusive right under a license agreement of 1944 from Mrs. Heindel to publish and sell such writings. Injunctive relief was granted against plaintiff corporation wherein it was restrained from doing various things later mentioned herein. From the judgment it is clear that the main object was to preserve the use of the property to the followers of the philosophy, and as later seen, not to interfere with them in the exercise of their ecclesiastical functions.

The main contention of plaintiff corporation on this appeal is that the court had no jurisdiction to decide who was entitled to exercise the ecclesiastical functions pertaining to the rosicrucian philosophy; that first the unincorporated church association and later the defendant corporation and members had such power.

The provisions of the judgment and discussions during the trial, taking them as a whole, though in part couched in language dealing with ecclesiastical functions, purport to deal with civil and property rights, such as, who may use the property at Mt. Ecclesia, lists of members, rights to property, rights in the writings and disposal thereof, solicitation of members and contributions. It should be observed that various rights affected by the judgment have civil and property right connotations. Illustrations are: The right to use a name "The Rosicrucian Fellowship" (see *Law* v. *Crist*, 41 Cal.App.2d 862 [107 P.2d 953]); the publication and sale of copyrighted books and documents and emblems (see *Johnston* v. *20th Century-Fox Film Corp.*, 82 Cal.App.2d 796 [187 P.2d 474]); mailing lists (see *California Intelligence Bureau* v. *Cunningham*, 83 Cal.App.2d 197 [188 P.2d 303]). Hence

the judgment may well be proper as reaching and affecting such rights, as it does, although by its language it might seem to go further and declare who may carry out so-called ecclesiastical functions, which may include the right to use the property to teach the philosophy and the solicitation of members and contributions.

The general rule that courts will not interfere in religious societies with reference to their ecclesiastical practices stems from the separation of the church and state, but has always been qualified by the rule that civil and property rights would be adjudicated. (See *Watson* v. *Jones*, 13 Wall. (U.S.) 679 [20 L.Ed. 666]; *Church of Christ of Long Beach* v. *Harper*, 83 Cal.App. 41 [256 P. 476]; *Dyer* v. *Superior Court*, 94 Cal.App. 260 [271 P. 113].) There are two ways in which the problem may arise. The question may arise as to the extent to which the court is bound by the decisions of the church tribunals in either ecclesiastical or temporal matters, or the scope of the jurisdiction the court will exercise when there are no such tribunals but there are disputes between factions concerning ecclesiastical and temporal matters. In the instant case the court found that there was no established church system or government therefor and hence no church tribunals. Whether an activity is ecclesiastical or involves property rights, especially when a decision on one necessarily involves consideration of the other, are difficult questions. Ecclesiastical matters include in the main, creeds and proper modes of exercising one's belief. While the principle that courts will not purport to exercise ecclesiastical jurisdiction is settled as an abstract proposition, they will determine civil and property rights which depend essentially on the contracts of the parties as evinced by rules, regulations, practices and customs accepted and followed. The matter has been generally summarized: "It is obvious that no case can reach the civil courts unless it involves some property or other civil right. The courts of the land are not concerned with mere polemic discussions, and cannot coerce the performance of obligations of a spiritual character, or adopt a judicial standard for theological orthodoxy, or determine the abstract truth of religious doctrines, or adjudicate whether a certain person is a Catholic in good standing, or settle mere questions of faith or doctrine, or make changes in the liturgy, or dictate the policy of a church in the seating of the sexes, or the playing of instrumental music, or decide who the rightful leader of a church ought to be, or enjoin a clergyman from

striking the complainant's name from his register of communicants, or enforce the religious right of a member to partake of the Lord's Supper." (American Church Law, Zollman, § 313.) It is also settled principle that: "It is perfectly clear that, whatever church relationship is maintained in the United States, is not a matter of status. It is based, not on residence, or birth, or compulsion, but on voluntary consent. It rests on faith, 'primarily, faith in God and his teachings; secondarily, faith in and reliance upon each other.' It is 'one of contract,' and is therefore exactly what the parties to it make it and nothing more. A person who joins a church covenants expressly or impliedly that in consideration of the benefits which result from such a union he will submit to its control and be governed by its laws, usages and customs whether they are of an ecclesiastical or temporal character to which laws, usages, and customs he assents as to so many stipulations of a contract. The formal evidence of such contract is contained in the canons of the church, the constitution, articles, and by-laws of the society, and the customs and usages which have grown up in connection with these instruments." (American Church Law, Zollman, § 328.)

There appears to be no question between the parties here as to the proper way or method of teaching the philosophy or its principles. Rather, the dispute concerns who shall have the right to use the property, to teach the philosophy, and exercise the other rights herein enumerated. Closely related to the right to use the property are also involved the rights of solicitation of, and contributions from members, and of selling the writings. In fact, plaintiff corporation by its complaint demands a settlement of these matters for it prays that it should be accorded the right to solicit membership and contributions, to use the writings, have the mailing lists and be free from interference in conducting its meetings, services and lectures. Moreover, the dispute between the parties has been going on for many years and should be settled.

In connection with the jurisdictional question, plaintiff corporation argues further, that religious organizations are dual in nature, one part consisting of the members as a spiritual body, and the other as an unincorporated entity constituting the secular body; and that the plaintiff corporation here is the secular body. It is argued that this was determined by the decree in *Weaver* v. *Meyncke*, and reference is made to statements that a church society does not lose its identity by incorporating; that the corporation and the church, although

one, may exist within the pole of the other, are not correlative, but each is independent of the other, one dealing with spiritual things and the other temporal. (See 45 Am.Jur., Religious Societies, § 8; *Wheelock* v. *First Presb. Church,* 119 Cal. 477 [51 P. 841].) ▮▮ The essential problem, nevertheless, is to ascertain from the acts, dealings and usages of the parties where the various rights rest in order to determine the ownership of civil and property rights, even though some so-called ecclesiastical rights are involved. Plaintiff corporation was found to own the property at Mt. Ecclesia but as a trustee for the unincorporated church, its members, and defendant corporation and its members. Organized, or unorganized, or lacking in an established church government, the followers of Mr. and Mrs. Heindel, and later of Mrs. Heindel, were as a group, the beneficiaries, and as such have always possessed the other rights accorded them in the judgment. As shown by the discussion earlier in this opinion some of the so-called ecclesiastical functions are so interwoven with civil and property rights that any decision involving the latter must necessarily affect the former. Moreover, it was recognized in the recitations in the 1931 contract with Mrs. Heindel, that both plaintiff corporation and the followers as a group had some rights somewhat in the nature of both ecclesiastical and property.

Plaintiff urges that generally courts have classified religious organizations into three categories: (1) Where one or a few persons, usually claiming divine right, control the whole hierarchy, including the local churches or societies; (2) Where there is a similar hierarchy but an assembly is in control; and (3) Where each local group is in charge of all its affairs through majority vote of its members and there is no control from above. (See *Watson* v. *Jones, supra*; 45 Am.Jur., Religious Societies, § 4.) It is also urged that where there is a schism or split between the followers or members of a society in the third class, or in an anomalous class which fits in none of the three, like the Rosicrucians, those adhering to the original structure, whether or not they constitute a majority of all the members, are declared to have all of the property rights. It is argued that plaintiff corporation is the original structure and, therefore, it must have the property rights rather than the unorganized church or followers who later formed defendant corporation.

The basic question in a controversy such as this should be the ownership of civil and property rights as shown by the

conduct and acts of the parties. A classification based on a formula is not of much assistance, especially when we have, as we do here, an anomalous arrangement. (See American Church Law, Zollman, § 328, *supra*.) Nor is it important whether a schism in the technical sense has occurred so far as the creed or philosophy is concerned, and the findings and judgment on a whole show that there has been none. It appears that from the first, the unorganized church and its members through its leaders, the Heindels, have exercised property and civil rights incident to ecclesiastical functions which were not surrendered to plaintiff corporation. As heretofore stated the court found that centers, or groups of followers, were formed by Mr. Heindel in 1909, before plaintiff corporation was formed. It was also found that after the marriage of Mr. and Mrs. Heindel, they taught, wrote, sold writings, and solicited members; that from 1910 to 1913 their followers constituted an unincorporated church association known as "The Rosicrucian Fellowship"; that the Mt. Ecclesia property was purchased and improved in part by contributions from those followers and the property was declared by Heindel to be held in trust for the followers; that plaintiff corporation was formed in 1913 to hold Mt. Ecclesia for the benefit of the followers, but without their consent; that from 1913 to 1919, the Heindels, with the assistance of the followers as members of the church, "conducted all ecclesiastical functions for the church" and continued to do so until 1944. Those functions included obtaining contributions, using Mt. Ecclesia, lecturing, teaching, the preparation, dissemination and sale of writings which had, as above seen, property and civil right aspects; that Mt. Ecclesia was deeded to plaintiff corporation in trust for the benefit of the followers but title to the writings was retained by Mrs. Heindel; that plaintiff corporation conducted certain business affairs all for the benefit of the unincorporated church, and that it also performed some so-called ecclesiastical functions without the consent of the followers who did not waive their right to organize themselves into a permanent church organization but did organize defendant corporation with a complete church government. In short, the true organization was the unincorporated church association, its members and the members of defendant corporation which was incorporated in 1944. It was, and is, the true and original structure, in ecclesiastical and secular activities, and any functions exercised by plaintiff corporation, except the management of the Mt. Ecclesia prop-

erty and the license from Mrs. Heindel to use the writings, were usurped by plaintiff corporation. The court found that a majority of the followers formed defendant corporation and while that was a factor considered by the court in reaching its conclusion as to the ownership of the rights, it was also predicated on the premise that the unincorporated church was the basic group and owned most of the rights. The judgment preserved to plaintiff corporation the limited rights as trustee of Mt. Ecclesia and the license to use the writings. From the foregoing it is clear that the court did not adopt any different system than had existed for the ownership and exercise of the rights involved as claimed by plaintiff corporation. It determined the basic rights of the parties as shown by custom, usage, and past practices of the parties themselves.

Plaintiff asserts that no notice was given to the followers of the formation of defendant corporation; that a majority did not agree thereto; and that the court erred in considering the number who had joined at the time of trial rather than the number at the time the action was commenced. The court found that by April, 1945, 541 probationers and disciples out of 706 in the United States had become members of defendant corporation, which is, of course, a majority. ██ Inasmuch as this action is in the nature of an equitable proceeding, the court may consider the facts as they existed at the time of trial so that the interests of justice may be subserved. (*Mercer Casualty Co.* v. *Lewis*, 41 Cal.App.2d 918 [108 P.2d 65].) Defendant corporation has offered to prove here that most of the foreign followers have also applied for membership. We think that is unnecessary as we feel the court was justified in assuming that a sufficiently substantial number of those who could reasonably be reached had joined. Moreover, we understand the judgment to accord the rights to all members of the unincorporated church association, as well as defendant corporation, and hence the foreign followers have not been prejudiced.

Plaintiff asserts there cannot be two corporations, plaintiff and defendant, with one controlling temporal affairs and the other, a religious corporation, controlling ecclesiastical matters. It is contended that a corporation cannot be formed for ecclesiastical purposes, that it may exercise only temporal powers. (*Wheelock* v. *First Presb. Church,* 119 Cal. 477 [51 P. 841].) In that case, the court speaks of the formation of nonprofit corporations for religious purposes, which could be formed for any lawful purpose under former section 593 of

the Civil Code, which authorized the formation of corporations for secular purposes only. Defendants urge that corporations may be formed to carry on religious, as well as temporal functions, under the law existing when defendant corporation was formed. That law, now Corporations Code, section 9200, provides that nonprofit corporations may be formed for any lawful purpose for which persons may associate themselves, such as religious purposes. ■ However, it is not material here, because, as we have seen, the rights which we interpret the judgment to affect, are essentially property in nature and we see no reason why some of them may not be in plaintiff and others in defendant corporations in accordance with the conduct and usage of the parties. The judgment states that all of Mt. Ecclesia, and the personal property thereon, is held by plaintiff corporation for the use and benefit of cross-complainants as probationers and disciples of the philosophy, "as members of the unincorporated church association organized in 1908 and 1909" and as members of "defendant corporation, as beneficiaries." Thus, all followers, whether members of the unincorporated church, or the defendant corporation, are beneficiaries and may use the property. We do not construe it to mean that only the members of defendant corporation are beneficiaries entitled to use the property. Hence it is of no particular consequence whether defendant corporation was formed for a valid purpose, or that members of defendant corporation are also mentioned as beneficiaries because members and followers of the philosophy are the true beneficiaries.

Plaintiff corporation claims that the church association and its members turned over the functions of conducting the church to it and that they are now estopped to claim those functions or that the association is unincorporated. It refers to the finding that at all times after 1913 (the date of its formation) the church association and its members were unincorporated but it was also found that it, plaintiff corporation, conducted temporal and secular functions for the members of the church association and has the right, subject to the dominant right of the association, to use the property for temporal purposes; that the church association was formed and regulations adopted by it without the consent of plaintiff corporation. Plaintiff corporation appears to assert that it has the right to exercise ecclesiastical functions, a matter which in other places it claims a corporation cannot have. The findings show that from 1913 to 1924 plaintiff corporation con-

ducted "certain" secular functions and the judgment accorded it that power. It was also found that the followers did not consent to the formation of plaintiff corporation or its regulations. In this connection plaintiff asserts that the judgment in *Weaver* v. *Meyncke* is contrary to the present holding. We find nothing inconsistent in the holding of these cases. In the Weaver case the main question was whether the trustees of plaintiff had misappropriated trust funds. It was there found that plaintiff corporation was a corporation and its articles were legally amended; that none of the members of the unincorporated church were members of the corporation or entitled to vote for the trustees thereof; that such members had not been deprived of any right in the corporation. It was also found, however, that the members of the church were cestuis of the corporation trustee and were entitled to apply to the court for relief from any corporate mismanagement; that the property was held by the corporation as trustee for the members, all in harmony with the judgment here. So far as the legality of the formation of the corporation and amendments of its articles is concerned, the law may have been complied with without constituting a surrender by the church association and its members of all their rights to the property. Reasonably interpreted, the Weaver findings and judgment do no more than generally recognize plaintiff corporation as owner of Mt. Ecclesia as trustee for the unincorporated church association. It does not purport to deal with the right to use the property or the details of the ecclesiastical rights which have property right aspects (as heretofore mentioned) which have been exercised by the unincorporated association.

The essence of plaintiff's contention in this respect seems to be that since the unincorporated church association had surrendered all its rights and powers to it, and that as it, plaintiff, had exercised those rights over a period of time with the acquiescence of the association, the latter is now estopped to assert them. As heretofore seen, the court found that there was no waiver by, or estoppel on the part of, the church association or its members, and that they owned the rights subject to certain rights in plaintiff; that there was an organized system or church government, and that the members did not consent to the incorporation of plaintiff or amendments to its articles of incorporation. We cannot say there has been a surrender of all rights to plaintiff, or a recognition that plaintiff had all of those rights, as was the case in *Baker* v. *Ducker*,

79 Cal. 365 [21 P. 764], *Bear* v. *Heasley*, 98 Mich. 279 [57 N.W. 270, 24 L.R.A. 615] and other cases cited by plaintiff.

Plaintiff asserts that the evidence shows it was to have all of the rights above mentioned. Specifically, it is asserted that Heindel told the followers in 1912 that he intended to form the corporation, that articles were filed in 1913 in which the Heindels were two of the five incorporators, and the followers were told of the incorporation; that Seattle center followers turned their assets over to the corporation and took their instructions in the philosophy from plaintiff; that plaintiff corporation adopted and enforced rules dealing with the operation of the philosophy; that it has enrolled a substantial number of followers; and that Mrs. Heindel organized a church, Max Heindel Rose-Cross Philosophies, which was dissolved by the 1934 agreement. On the other hand, there is evidence that instructions in the dissemination of the philosophy were not taken from plaintiff; that plaintiff was first organized as a college or seminary corporation and it was to be only the trustee of the property; that Heindel did not transfer the property to plaintiff; that the property was not transferred until after his death; that the Heindels and followers were carrying on so-called ecclesiastical functions and using the property to disseminate their writings; that Mr. and Mrs. Heindel were the leaders in the church association (later, Mrs. Heindel was the leader); that the unorganized church association used the name "The Rosicrucian Fellowship" and was the church rather than plaintiff; that title to the writings has always remained with Mrs. Heindel; that only physical, or purely business, functions were carried on by plaintiff; that plaintiff has no members except the trustees who were self-perpetuating. It was for the trial court to weigh the evidence and draw any reasonable inferences deducible therefrom. Hence the authorities (*Linke* v. *Church of Jesus Christ*, 71 Cal.App.2d 667 [163 P.2d 44], and others) cited by plaintiff to the effect that one who joins a church submits to its constitution and by-laws, are not in point. We think it is clear from the record that the church was the unincorporated association of followers as found by the court.

Near the end of the trial, without objection and by leave of court, defendants amended their cross-complaint by adding an allegation to the effect that the action was prosecuted for the benefit of all those persons in the United State who are believers in the philosophy as taught by the Heindels, and stated that there were approximately 706 such persons; that

it would be impracticable to name them all as parties. In other words, the cross-complaint was amended to show that the action was a representative one. Plaintiff claims that it was not a proper case for a representative action in that it did not purport to include followers outside the United States; that it was not brought in good faith, because counsel for cross-complainants stated in court that the representation was only of defendant corporation members; that the defendant corporation cannot be a representative inasmuch as its interests are adverse to those purported to be represented. It further claims that because the action was not a representative one, all the believers were indispensable parties.

We believe the cross-complaint pleads sufficient facts to make this a proper representative suit. There was no bad faith shown on the part of the cross-complainants. The discussion with reference to the amendment of the cross-complaint was general and, at the trial before the amendment, the action was treated as a representative one to which plaintiff made no objection. The cross-complainants, other than defendant and cross-complainant corporation, are followers of the philosophy. The basic issue involved was as to the dominant use of the property and, as we have seen, the judgment, if properly interpreted, preserved that use to all the followers, whether members of the unincorporated church association or defendant corporation. Followers, other than members of defendant corporation, are not excluded nor are members in foreign lands deprived of any rights. Whether the foreign members are bound by the judgment need not be determined. It follows that there is no adverse interest because the judgment protects all followers, and we see no reason why the followers who are cross-complainants could not, in part at least, choose a corporation they had formed, the defendant corporation, to lead in the representative suit. Generally speaking, in controversies such as this it is considered that: ". . . [P]laintiffs [members of a church suing in behalf of all] bring the action for the benefit of all the members of the . . . Church. In effect, each member is a party plaintiff, and that all the members could jointly bring the action we feel well assured. It is said in *Smith* v. *Swormstedt*, 16 How. (U.S.) 288 [14 L. Ed. 942] : 'The rule is well established that where the parties interested are numerous, and the suit is for an object common to them all, some of the body may maintain a bill on behalf of themselves and the others; and a bill may also be main-

tained against a portion of a numerous body of defendants representing a common interest.' *Baker* v. *Ducker*, 79 Cal. 365 [21 P. 764], is to the same effect." (*Wheelock* v. *First Presb. Church*, 119 Cal. 477, 481 [51 P. 841].) It is apparent that if this is a proper representative action all the persons represented are not indispensable parties. If plaintiff's argument is to prevail, it is doubtful that the controversies here could ever be settled unless every follower here, and abroad, was made a party. Obviously, this would not be feasible.

Plaintiff makes several contentions with reference to the court's determination that the 1934 agreement was breached and cancelled and that the 1931 contract was in force and effect. The court found, as above noted, that the sole consideration for Mrs. Heindel's agreement in the 1934 contract to give plaintiff an exclusive license to use the writings, was plaintiff corporation's promise that she would hold the positions with the corporation heretofore mentioned for as long as she desired; the court found plaintiff breached the contract in 1942-1944 by removing her from the positions in failing to reelect her.

Plaintiff argues that the contract does not require that she hold positions so long as she desires as found by the court. We feel that the trial court's construction of the contract is reasonable when all the circumstances are taken into consideration. It will be recalled that the agreement recited that the 1931 contract had dealt with the right to the writings, that Mrs. Heindel could grant to an organization sponsored by her, a license to use the writings; that she had formed a thriving organization; that plaintiff corporation, which advocated the philosophy, had prospered and had funds; that the two organizations should unite for more effective operation under the name Rosicrucian Philosophy; that the organization formed by Mrs. Heindel should be dissolved and the writings held by it turned over to plaintiff. It was agreed that a repetition of a two-organization situation was injurious and was to be avoided; Mrs. Heindel's years of work were recognized. All of those factors indicated an intent to compromise. These factors showed that although plaintiff was to have the right to use the writings and Mrs. Heindel could not give that right to another organization, Mrs. Heindel was not to lose complete control of the writings or the situation. It was then provided that Mrs. Heindel should be elected trustee and to fill vacancies to be created in other positions, including chairman of the executive com-

mittee, composed of five, and to be "manager in charge" of the fellowship activities; she was to write, supervise the preparation of writings and was to be editor of the magazine; and finally, because Mrs. Heindel spent years working in the philosophy, she was to have assurance that "if at any time she ceases to be active in connection with the work and retires from authority," she was to become "President Emeritus." It is inferable therefrom that she was not to become president emeritus until she voluntarily retired from authority. This indicated that until she did so retire she was to hold the positions named and retain the authority. If it were otherwise the other trustees could, at their will, make the agreement meaningless by removing her from the positions, thus leaving her a mere empty right. That she was to hold them as long as she desired is further evidenced by the fact that the trustees acquiesced in the occupancy of the positions by Mrs. Heindel from 1934 until 1942.

Reference is made to the judgment in *Weaver* v. *Meyncke*, where it was said that Mrs. Heindel's removal from the positions held by her was "legal." That issue was not involved in that case, and although the procedure may have been "legal" there was nothing to indicate what the consequences of the breach of the 1934 contract would be.

It should also be observed that plaintiff claims the contract cannot be properly litigated here because Mrs. Heindel, not defendant corporation, was a party to the contract but that she is not a party here except as a representative of the followers, by amendment to the cross-complaint. We have concluded that she is a party to this action. She was named individually as defendant by plaintiff, and as cross-complainant in the cross-complaint, and we do not believe the amendment excluded her as an individual. She has taken an active part in the litigation and will, unquestionably, be bound by the judgment.

For the reasons above discussed the court was justified in finding a breach and cancellation of the 1934 contract. Implicit in the finding is the conclusion that the breach and failure of consideration was of a substantial character although the part of the contract which was breached was not the sole consideration therefor as Mrs. Heindel was to receive, in addition, sustenance at Mt. Ecclesia.

Plaintiff urges that there was no allegation of an offer, or any offer, to restore the consideration received by Mrs.

Heindel under the 1934 agreement and that such an offer was necessary. Most of the matters in the other counts were reiterated in the fourth count of the cross-complaint, and the 1931 and 1934 contracts are pleaded *in haec verba*. It was also pleaded that the 1934 contract modified the 1931 contract with respect to Mrs. Heindel's right to grant a license to use the writings and that the sole consideration therefor was that Mrs. Heindel was to have living quarters at Mt. Ecclesia and hold the positions as long as she desired; that in 1942-1944 plaintiff caused Mrs. Heindel to be removed from the positions in violation of the contract; that on October 7, 1944, Mrs. Heindel gave notice to plaintiff of the termination of the contract; that a controversy exists between the parties as to whether the contract is still in effect.

We must look at both contracts to see what Mrs. Heindel was entitled to receive and what she did receive under the 1934 contract. Provision was made in the 1931 contract, which was continued in force except as modified by the 1934 contract, for an annuity. The annuity provisions were the same in both contracts so she would not be required to restore any money received thereunder. The plaintiff and Mrs. Heindel have the right to use, and Mrs. Heindel is the owner of, the writings under both contracts. Plaintiff could not, but Mrs. Heindel could, grant to an organization sponsored by her, a license to use the writings. In the 1934 contract she gave up that right. Under the latter contract she sold certain assets at their market value; that part of the contract was performed. The additional things which Mrs. Heindel was to receive under the 1934 contract, and which would be the only ones considered so far as restoration is concerned were that she was to have living quarters at Mt. Ecclesia and to be allowed "sustenance" at the cafeteria there. She testified that she used the $3,200 she received from the transferred assets for furniture, supplies, and the houses in which she lived, and that she received "no compensation" and no "consideration" for giving up her right to license the use of the writings to another. ▇ Plaintiff claims that was a conclusion drawn by Mrs. Heindel and that it was not evidence, citing *Huntsman* v. *State Harbor Commrs.*, 17 Cal.App.2d 749 [62 P.2d 771], but no objection was made to the answer and it may be considered as showing that she did not receive consideration. In the Huntsman case the question was whether there was a valid contract insofar as consideration therefor was concerned. The contract there provided for consideration

on its face. The question here is whether the promised consideration was received as it relates to the necessity for restoration. In addition, Mrs. Heindel prepared writings and lessons for the corporation, performed services for it and refrained from licensing the writings to others, all of which may be considered to have been of some value. Under all the circumstances we believe there was nothing of consequence required to be restored.

In this connection plaintiff argues that the pleading was insufficient because it did not allege that restoration was not necessary. Liberally construed, the cross-complaint was sufficient to advise plaintiff of the issues to be met. Moreover, it should be observed that plaintiff elicited from Mrs. Heindel the answer that she had received no consideration during its examination of her under section 2055 of the Code of Civil Procedure. While it was not bound by that testimony it was brought out as a material issue.

In the same connection, plaintiff claims the court committed reversible error in sustaining an objection to a question asked Dodson, plaintiff's treasurer, as to whether Mrs. Heindel had offered to restore, or had restored, anything she received under the contract. Our conclusion that Mrs. Heindel had received nothing worthy of restoration answers this argument of plaintiff.

Plaintiff claims that the injunctive provisions of the judgment are improper. It asserts that there is no pleading or proof to justify them, that they are uncertain, that some of them consist of restraining libelous and slanderous statements which are not cognizable in equity since such restraint would constitute an unwarranted interference with freedom of speech.

The cross-complaint appears to plead primarily a cause of action for declaratory relief but plaintiff does not assert that a declaratory judgment may not also give injunctive relief in an equity case. The cross-complaint prays for a declaration of rights and such other relief as may be proper. The injunctive part of the judgment restrained plaintiff from (1) asserting ownership of the property except as trustee for the beneficiaries; (2) interfering with their use of the property in the conduct of ecclesiastical functions; (3) conducting or interfering with the conduct of ecclesiastical functions; (4) claiming the exclusive right to use the name "Rosicrucian Fellowship"; or interfering with its use by cross-complainants; (5) interfering with the use by the followers of the lists and

stencils, etc., of names and addresses of followers; (6) claiming defendant has no right under the license from Mrs. Heindel to print and distribute the writings; (7) interfering with the use by Mrs. Heindel, or defendant corporation of the plates for printing the writings; (8) making either oral or written statements that Mrs. Heindel was untruthful, had selfish purposes in organizing defendant corporation, or that defendant corporation was an outlaw organization, or otherwise doing acts to deter followers from becoming members of defendant corporation; (9) interfering with the exclusive use by Mrs. Heindel, or followers designated by defendant church, of confidential discipleship instructions prepared by her. The court found that since 1943 plaintiff corporation had taken various steps to prevent the followers from organizing themselves into a church organization. Those steps consisted of claiming power to expel, and expelling followers, making statements in derogation of Mrs. Heindel, and casting aspersions on defendant corporation so as to deter followers from becoming members, and assure continued adherence to plaintiff. It was also found that plaintiff corporation has excluded members who participated in the organization of defendant corporation from the use of the property; that plaintiff corporation took possession of philosophy instructions written by Mrs. Heindel; that plaintiff threatens to, and will unless enjoined, continue to do those things; that plaintiff claims the right to expel followers, and exclude them from the use of the property for ecclesiastical and other purposes; that plaintiff has prevented the use of the list of names, addresses, and stencils.

That plaintiff is continuing these claims appears from the prayer of its complaint where it asks that defendants be restrained from using the name ''The Rosicrucian Fellowship'' or anything like it; from soliciting followers for contributions; and from using any of the writings.

It is true that an injunction ''is ordered against past acts only if there is evidence that they will probably recur.'' (*Hannah* v. *Pogue*, 23 Cal.2d 849, 858 [147 P.2d 572].) We believe, however, the record sufficiently indicates that the acts will probably recur. It is not unreasonable to suppose that assertions of claims to the property will be injurious to cross-complainants.

There is no merit to the claim of uncertainty in that part of the injunction which restrains interference with the dominant use of the property for ecclesiastical purposes by

the followers. "Dominant use" clearly means the superior right and the judgment in other parts heretofore quoted defines such rights.

Complaint is made that the eighth provision of the injunction, heretofore mentioned (paragraph C[9] of the judgment), violates the right of freedom of speech and is like an injunction restraining slanderous or libelous statements. It is established that an injunction will not be granted where the restraint interferes with freedom of speech. (See *Near* v. *Minnesota ex rel. Olson,* 283 U.S. 697 [51 S.Ct. 625, 75 L.Ed. 1357] ; *Dailey* v. *Superior Court,* 112 Cal. 94 [44 P. 458, 53 Am.St.Rep. 160, 32 L.R.A. 273] ; *Magill Bros., Inc.* v. *Building Service etc. Union,* 20 Cal.2d 506 [127 P.2d 542] ; *In re Wood,* 194 Cal. 49 [227 P. 908] ; *Orloff* v. *Los Angeles Turf Club,* 30 Cal.2d 110, 117 [180 P.2d 321, 171 A.L.R. 913].) While it has been said that an injunction may be granted to restrain the making of false or libelous statements where there is a breach of trust or contract, to injure business relations (see Pomeroy's Equity Jurisprudence, 5th ed., § 1358; 28 Am.Jur., Injunctions, §§ 118, 119) and although there are property and contract aspects in this case, the provision here is too broad and does impinge upon freedom of speech especially when we consider that religious controversies are also concerned. Hence paragraph C(9) of the judgment must be, and is, stricken.

 Plaintiff urges that it should have been granted injunctive relief. The judgment declares plaintiff's rights and, as such relief is to some extent discretionary with the court, (14 Cal.Jur. 185-186) we do not think a reversal is justified.

 Plaintiff claims error in the refusal of its offer of proof by a witness, Mrs. Murray. She had testified on direct examination that a list of members exhibited to her showed the number of followers who were members of defendant corporation. On cross-examination plaintiff offered to prove by her that the list was not a true one in that it contained names of persons who were not members of the fellowship or of defendant corporation. We do not think prejudicial error was committed when we consider that the trial court may have felt that it was unlikely the witness would change her testimony on direct examination and, as we construe the judgment, the rights are accorded to all followers of the philosophy whether or not they are members of defendant corporation.

The judgment is modified by striking out paragraph C(9) thereof, and as so modified, is affirmed. Respondents to recover costs on appeal.

Shenk, J., Traynor, J., and Spence, J., concurred.

Schauer, J., concurred in the judgment.

Appellants' petition for a rehearing was denied July 17, 1952.